The next matter is Barto v. McDermott, Shore Construction is the first defendant listed. Mr. Wells? Good morning, Your Honor. Morgan Wells for the appellants McDermott and Shore Construction. Briefly, kind of the order in which I was going to present the argument subject to any questioning, certainly from the panel, is briefly the standard of review, then liability, then damages. We think it's clear that a de novo review was warranted in this case based on a factual finding derived from an incorrect understanding of the law by the district court. And that is with respect to the duty of an employer under the Jones Act. The district court held that the Jones Act employer has a non-delegable duty to provide a safe place to work. It also specifically held in finding McDermott liable that McDermott failed to provide Mr. Barto with a safe place to work by requiring him to either stand on the beam or the frame of the spooling machine, as some employees had done, or use some type of board as a scaffold. Well, the duty, as set forth in Gautreaux, is to provide a reasonably safe place to work. What happened in this case is that there was a condition that was created specifically by the Jones Act employee, Mr. Barto. Both parties gave the correct legal standard to the district court, correct? That's correct. And because it's a bench trial, it's not easy for us to sort of look at jury instructions. But he did describe it as a negligence case. He did. And he specifically held that there was no unseaworthiness of the vessel. He found that it was reasonably fit for its intended use. Does that imply that Judge Barbier had a pretty good awareness that this is an ordinary negligence standard? That's correct. But I think that there's a slight difference between the duty of a Jones Act employer to provide a non-delegable safe place to work and to provide a reasonably safe place to work. Essentially, what he held was strict liability on the part of the Jones Act employer for a condition that was caused by the employee. So, in effect, what happened was he transferred the legal cause of the accident caused by the employee to the Jones Act employer and failed to provide the analysis from the GOTRO decision in that there's a reasonably safe place to work. A lot of his discussion wouldn't make sense if he's making that very elemental strict liability misapprehension. In other words, when he's saying, well, there was scaffolding over there that they could have used, that all sounds like he is assessing negligence. Although he ultimately concludes there's no contributory negligence, comparative negligence, right? That's not required, and the case law is clear. There's a circuit case law specifically that has held that if there's a safer alternative, it doesn't mean that the method that was employed was unsafe. And I think he mischaracterized that in some respect because there was perhaps a more safe or something else that could have been done that that, in effect, was an unsafe condition that was created, which wasn't the case. Even if, in effect, what the GOTRO decision held is that there must be fault in the Coburn and Verrett cases, Fifth Circuit cases, held that under the Jones Act, the duty of an employer is not a strict liability situation, but fault is required. There was no fault proven on the part of McDermott in this case. Even if this court were to review it from a clearly erroneous standard, then I think under that scenario as well that the decision must be reversed. The Fifth Circuit said that when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed, the finding is clearly erroneous. The court found the DB-50 to be seaworthy. It was fit for its intended use. There was no evidence to suggest that McDermott failed to use reasonable care to maintain a reasonably safe place to work. The sole legal cause of this accident was the decision by Mr. Bartow to take a board, which was in a stack of bundled boards, which it was referred to in the record as a fur board, and those boards were used to repair damage to deck boards. He selected from a bundle a board that had a notch cut out of it, and I think you've seen photographs of the notch. I presented to the deputy clerk, just for the court's reference, and one I think was not an excerpt, but it was in the record. It was an exhibit, which I provided, and that was in the preliminary incident information of McDermott, and that shows the board. There was no dispute that it cracked where the notch was cut out. But the judge's explicit findings of fact were to declare Bartow a very credible witness, so when he claims that it was the full, thick, two-foot portion that was on the frame, he credited that testimony, and therefore, you put that with witnesses like, what was his name, Valasilo? Valicello. Valicello, thanks, who said, I used to do that too. Well, there's a difference, though. If you look at – first of all, it's implausible and impossible for this board not to crack unless that section of the board is resting. If there's no pressure on that board, if it extends over the frame, there's no pressure on that portion of the board to crack. So logically, in order for that board to crack, it must be resting on the frame. But he discredited that. The district judge explicitly said, I credit. Well, I think he surmised, and if you read his decision closely, he said that what happened was if he put it extending over the frame, it must have moved because he acknowledged that in order for it to crack, that crack or the cutout, the notch portion, must have been. There's no other way forth to crack. You've got 15, 20 minutes moving back and forth, and you've got this giant spooling thing that's vibrating. It's pretty understandable that it could shift, and it could have shifted on the fellow whose name I can't pronounce and could have snapped there too. This is not like the cases you cite to us, Harrison and Salas, where the accident occurs where people are carrying water or carrying equipment. Instead, these are people who are climbing up whatever disputed feet that is and then doing this very hazardous task that is done once every two years. I think that's basically what Judge Barbier's ruling was. Well, I think what Judge Barbier was saying, and I think the reason he came to his conclusion, was that in general, this operation is not done routinely, and it's not. The McDermott supervisors testified that they used the firm boards also, so he wasn't going to fault this newbie for using the same thing that the supervisors used. Well, but nobody used, and everybody agreed that he shouldn't have used, and he was the only one that selected the board from a group of boards that he should not have chosen. Right, but the notch was discounted. You've lost that issue. ...performing that task, didn't they? Judge Benavides, could you start over? I was speaking the same time you were, and I don't think the question came across. Could you repeat your question? Well, he selected the board, but other people in performing that task also use a board. They may not have selected the board that he used, but other people used the same system, didn't they? Not on this particular operation. That had been done in the past, that the workers for McDermott stated that they had used a fir board at a height of two feet and not four feet that he claims, and if you look at the photographs, it's implausible for him to be at a height of four feet, and I'll explain that in a minute. But I think the testimony from the McDermott personnel was that we had used boards to stand on in the past, but no board had a notch cut out of it, and the sole cause of the accident was the notch in the board that only Mr. Bartow selected. Nobody else knew that he was ... My point is there was a finding by Judge Barbier, just credibility finding, that the notch wasn't ... he didn't put the precarious board in a way where the notch was holding his 219-pound weight. He didn't do that. That was Barbier's finding. But he, that was initially, he made that assumption, but then he said it must have moved because without the board, without some pressure being on that part of the board, it's impossible for the board to crack. And your argument, and I assume you made it fully below, would be that his comparative negligence was that he didn't secure it, but I don't see that the other gentleman testified that he would secure this either when he did this. Well, there was no testimony. First of all, Judge Barbier did not say that the testimony of the McDermott personnel were not credible. That testimony was not credible. He just said that he found him to be credible and that he wasn't exaggerating his complaints of pain. If you, I pulled the photograph of the spooling machine and the McDermott preliminary incident information report to highlight the fact that on the day of the accident and immediately after the accident, Mr. Bartow identified, and this is on the bottom, the bottom two photographs of the McDermott preliminary incident information, he identified where he placed the board. And that was on that lower frame, which was only two feet above the deck. And then the second photograph to the right is the crack board where it had to have cracked, and it's illogical for it to crack if there's no pressure on it. The other photograph is of the spooling machine itself, and Mr. Bartow then later testified, he contradicted his own information given to McDermott on the day of the accident, that he laid the board on the upper frame, and that is the two, which is about four feet high off the deck, laid it completely across and stood on that board. Well, he's almost six feet tall, and the testimony was that the bottom of the spool where they were coiling the cable was ten feet from the deck. So if he's standing on a board four feet high and he's six feet tall, he's literally, his head is almost touching the bottom of the spool, and his testimony and the uncontradicted testimony at trial was that they had to tap, well, actually use a two-by-four. They used a two-by-four just as one wrap came over, they would just tap it to slide it to make sure that it was flush next to the previous wrap. The process that was used immediately before Mr. Bartow, he was out there and he saw, I believe the gentleman's name was Eddie Nichols or Nick, Nick something, I forget his name, I apologize, Your Honor, use a two-by-four, and the method that was used was by standing on the deck, you're not climbing on anything, you stand literally on the deck of the vessel, use a five-foot two-by-four, and as it wraps you tap it to make sure it's flush to the previous wrap. Mr. Bartow testified at trial that, and this is in the transcript, it's page 1442 of the Record on Appeal, I had seen they were using a two-by-four trying to keep the cable wires together, and I started trying to do that, but that didn't work out because my shoulders went to hurting, my arms went to hurting trying to keep that together. And take in mind, this is a very slow process because the cable comes from the gantry crane through an EMAG machine, it's essentially an x-ray machine to try to identify any faults in the cable, then it goes to a core lube machine where they inject lubrication into it, and then it feeds through a block which is attached to a forklift, and this is a very slow process, and then it wraps onto the spooling machine, so it's not like it's a continuing wrap and he's constantly doing it, it's a very slow start and stop moving process, and it's only occasionally that he has to tap the cable. Those are the factual arguments that you made. You don't have much time. Did you want to get to Madour and the damages arguments you're making? Time flies when you're up here. The only thing I was going to point out is that he testified, Mr. Bartow, that so I thought of another solution. I looked around. There was a longer hammer. I tried to use that, and then he selected the board. That was completely his own decision, and he selected a defective board. The other issues and to find zero comparative fault on the part of Mr. Bartow is completely contradictory to the facts and the case law. What's your best case on that that we would find, we would reverse on that? What's your best case for no comparative fault? What is my, for no comparative fault? For that he committed clear error in not finding comparative. Because the sole legal cause of the accident was. What's your best case where we've done that before? The Harrison case. The Harrison case. But Harrison was, as I described, activity that has no descriptive ability to say it's hazardous, right? It's carrying equipment. Well. Okay, if Harrison's your best case, that's in your brief. Go ahead. And there are several cases that are in the brief. And all of the cases that the defendants have cited were where the plaintiff was following a direct order, even though he thought it may have been dangerous to do. He was following a direct specific order from the captain on the vessel, and they found he couldn't be held liable because he was complying with a direct specific order. Here, there was no direct specific order. He was the one who made that decision completely on his own. And the record is clear that he is a very experienced. Even though he's the low man on the totem pole or the least experienced doesn't mean that he was inexperienced. He had significant experience. He knew what he was doing. And that's why they gave him the task that required the least experience. I mean, it was kind of a commonsensical task that didn't require a significant amount of experience, and he had more than sufficient experience. On the damages issue, the future damage awards, that was completely out of line with not only the testimony and the evidence presented at trial, but the Lejeune case that I think that we cited in our brief. The testimony was that his back pain had gotten better, and the only pain that he was experiencing at the time of trial was around the incision site. And so to speculate on what his future pain and suffering would be and disabilities would be is not supported by the evidence. But what about the fact that he had life changes that he had experienced? He couldn't play with his children. He said he couldn't mow the grass. I don't know why that's a bad thing not to be able to do. But anyway, you've saved time for rebuttal. So if you will address that component, which would be part of future damages on your time you've saved for rebuttal. Thank you. That was a lot slower when you're sitting right there. Mr. Abramson. Good morning, Your Honors. May it please the Court, David Abramson, Louis Coleman Sterbko and Abramson on behalf of Mr. Bartow. And what I would like to do, Your Honors, is I'll address the issues as far as negligence comparative first, and future wage loss, the future general, and maintenance and cure as time may permit. Obviously, counsel spent a lot of time on the negligence comparative fault issues. You began by saying that it was an improper legal standard. Where in the record is there any reassurance that Judge Barbier had the right standard in mind? Record sites will help me. Well, I don't know that I can give you record sites other than what Your Honor talked about in terms of the explanation that he provided with respect to why he found that the McDermott was negligent and the reasons why he found the vessel was not unseaworthy. I think it would be a stretch of the imagination to believe that Judge Barbier, who practiced maritime law, is not familiar with the difference between the negligence standard and the unseaworthiness standard. And his only, as I recall, his only indication about the duty owed under the Jones Act is when he said that the employer had a non-delegable duty to provide a safe place to work. I think counsel, the appellants, are getting caught up on the fact that he didn't go on to say which means, the duty means they have to exercise ordinary prudence or exercise reasonable care under the circumstances. By the same token, he ruled from the bench. He didn't explain in his ruling the duty owed by the seaman, which was ordinary care for his own safety, taking into account his education, experience, and so forth. Which, since GOTRO, which Your Honor is very familiar with, has been the standard since 1997, and this court and the district court are well familiar with those standards. Shifting to that, thank you for the answer, but how is it when the rigger picks up the one board that has just a little sliver left and then he doesn't secure it? How do you still get to zero responsibility on his part? Because, and I think the judge explained this, he was inexperienced. First, he picked up another board, which he evaluated and had a long crack in it. He picked up this board, and what he did was he laid it across beyond the length of the cutout. The cutout part was the big issue at the district court level, not so much that he didn't secure it. The rub for me, insofar as this case was concerned, is that all of his supervisors were standing there watching him perform this. He had never done it before. They had all done it before. Some had used fur boards before. Some had just stood on the frame of it and done it before. They all sat there, watched him, could see what he was doing, and didn't instruct him to do anything differently or tell him that what he was doing was unsafe. So the fact that he didn't decide to secure it, I could see that it would have been well within the court's purview to find that he was in some way comparatively at fault. But the court didn't, taking all of these facts into consideration. And, you know, Ledette v. Smith-Marine says, when there are two permissible views of the evidence, the finder's choice cannot be clearly erroneous. Significant deference is given to the district court. The deference is even grainer when factual findings . . . Can you justify that there was no material like duct tape to secure it? I'm sorry? Did that come up in the testimony? Did he acknowledge . . . no. That was, again, the big issue as far as at the district court level was that he selected a board with a notch cut out. And he explained how he had extended the board beyond the notch cut out. And there was some testimony about it, that it should have been secured, but that wasn't the focal point. Is it true that no other McDermott witness said they ever secured either? I don't remember any testimony about a McDermott employee saying that they had performed this task and secured a board. Now, what I can tell you is that the McDermott personnel testified that scaffold was available and that scaffold could have been easily erected. Now, anecdotally, because this wasn't admitted, that's what they do now. Obviously, that was considered a subsequent remedial measure, so that didn't come into evidence. But I guess my point is this. If the judge had found that the plaintiff was 100% at fault or 10% at fault, that's a fair and permissible view of the evidence, in my view. By the same token, it's a fair and permissible view of the evidence for him to find that the defendant was 100% negligent for failing to supervise, failing to instruct, failing to perform a JSA, failing to use a safe alternative means like the scaffolding, and that the plaintiff, who was there performing the job, who had never done it before, was not a routine task, was an unsafe task, and whose supervisors were standing there watching him, was 0% at fault because they could have said, hey, you're not doing this safely, this isn't the way we do it, secure the board, pick another board, stand on the frame, don't use that, whatever the case may be. They were there and present, and they observed him doing that. So I think, you know, as far as that issue is concerned, there were permissible views of the evidence to allow the judge to decide that issue whichever way he wanted it, and if he had decided it against us, I don't think I would have had a leg to stand on here to come and argue that he picked a view that I didn't like. He would have been here anyway, right? I don't know. What was the leg to stand on in terms of the retirement age chosen by Judge Barbour? Yes, and to me, that's the more . . . as far as these issues are concerned, because Medea does say that unless there's evidence that the plaintiff would have worked longer and lived longer than the tables, that we should use the tables. Are you willing to concede that? No, I'm not going to concede it. I'm just going to say that's problematic. If you lose, do we have to remand, or would we render at whatever the number that your opposing counsel said, 2009? Here's what I think on that issue, and I will answer it. But there's a difference between the two economists. Our economist, who he chose to believe, has an age of 55.8 as the plaintiff's work-life expectancy and used the 67 years as the retirement age, Social Security retirement age. The judge said, I think he's going to work past 55.8, but I don't think he's going to work till 67, and he selected a figure between the two, which was $300,000. The defendant's expert used the work-life tables. But did both experts agree at the bottom end? Did they both agree what the average statistical work-life . . . ? No, and that's why I'm hedging on answering your question. The defendant's expert actually found that his statistical work-life expectancy based on the work-life tables was 58.22, which is more than the plaintiff's, 55.8. So if you're going to use the work-life tables, the $209,000 would be increased because there would be roughly three more years or two and a half more years of work-life to be included. So you could do one of two things on that issue in my view. I don't think it's unreasonable what the court did by choosing a figure between, because 58.22 is between 55.8 and 67, and the court didn't specifically say what age he thought that the plaintiff would work to. That way you win entirely, but what's your other option? I'm sorry? That's saying he got it right, but . . . The other option is to do either reverse and rule on the 209 or say I'm remanding because there's two and a half more years that we need to consider for purposes of that calculation that the plaintiff would be entitled to. I would like to say this, though, however, with respect to that decision, because in those that Medair or Medour and the cases that have discussed it, it talks about evidence of a longer work life and evidence of a longer life. I don't know what evidence could be presented beyond the testimony of the plaintiff and the judge providing an evaluation of the plaintiff's credibility, that he would work longer, that he had jobs that he was going to work, that if those jobs didn't manifest . . . Didn't elaborate much, and your client just said, I'll work until I retire, didn't peg it at that social security date. He said retirement age, which is 67. Working offshore, that's if you don't get hurt. That's anywhere, really. Maybe our jobs are a little safer sometimes. But . . . I lost my train of thought. I just want to take, by way of example, if something happened to me, and I appeared before, and my case was tried, the evidence that I would present was, I'm an attorney, I intend to practice until I can retire. I don't think I would be able to retire until I reach social security. They focused on that in the brief and said this guy had a really sporadic . . . never had one job more than a year. So if you start looking at what's in the record as to him, it isn't really suggesting work longevity forever. It's guesswork, I guess. I don't think it's guesswork. He had worked. I thought it was no job ever more than a year. But he had worked. Without interruption. Not without interruption, because he had unemployment benefits that he collected. But it's interesting that they make that argument when they want to argue against his wage loss claim, but they make the argument that he was an experienced . . . and had worked offshore at all these positions, when they say that he was comparatively negligent. So I don't think you can have it both ways. Unless Your Honors have more questions with respect to that issue, I'll move on to the future general damage award. McDermott says in its brief, the maximum recovery rule provides that the appellate court should reduce damages when the amount awarded is disproportionate to at least one factually similar case from the relevant jurisdiction, and cites Lejeune. But Lejeune doesn't say that. What Lejeune says is we apply the loosely defined maximum recovery rule when deciding whether a remediator is in order. This judge-made rule essentially provides that we will decline to reduce damages where the amount awarded is not disproportionate to at least one factually similar case from the relevant jurisdiction. So it doesn't say you find one relevant case. It says that we will decline to reduce damages where the amount awarded is not disproportionate to at least one factually similar case. That's a significant distinction. It's a big distinction linguistically, but you both practice in this area. What happens? Do they give . . . Are you obligated to canvass all relevant case law from the jurisdiction, and then you give them all to the judge? Well, I don't know. Because the next sentence says the maximum recovery rule does not become operative unless the award exceeds 133% of the highest previous recovery in the state. So you've got to find the highest previous recovery based on the . . . You found the one from Judge Vance that was a million plus. Right. That's the lowest. Right. What are lawyers doing? I mean, I agree with your textual reading of it, but I would think you would submit every case you could find that were factually similar in the jurisdiction and let the judge pick its case. Well, I think that's the problem. None of these cases are specifically . . . That's the whole rub to me. You can look at all of these cases and they're distinguishable, and when you have injuries, even though you might have the same . . . For example, in this case, three level . . . We don't have to wrestle with this because this wasn't even argued below. Is that correct? Do you remember your . . . No, no. This is not . . . The judge decided . . . Was the maximum recovery rule urged to Judge Barbier or not by opposing counsel? No, no. There would be no reason for it to be. In other words, the maximum recovery rule would not be part of the district court's findings of fact or conclusions of law. There's no . . . I don't know if you're . . . You know this area of law, and I know, but why wouldn't there be a forfeit charge? You would be urging it if there were, so you must be right. You're acknowledging that he didn't have to say, in connection with the damages argument, I'm asking you to apply the maximum recovery rule after the damages judgment comes down? If he filed a motion for a new trial or . . . That's the only way it comes up? The judges do this . . . We put on our evidence, and then at the end of the evidence, the judge decides what the damages are. We don't argue . . . Maximum recovery rule only comes up after if the defendant says, Hey . . . No burden of production. Judges have to do this on their own. Correct. At the trial court level. Why wasn't this tried to a jury? Because we had the right to choose judge or jury, and frankly . . . You chose Barbier, the . . . I frankly . . . Look, I had a choice with Judge Morgan recently. I chose . . . I like to trial cases to the judge. Frankly, I don't like all the histrionics of the jury. I mean, that's just a personal decision. I think if you look at my filings, you will see . . . When I have the opportunity to choose a judge versus a jury, I usually choose a judge. All right. One of the issues is that the future wage loss was . . . The future damage loss was too high because of the . . . I think he's going to argue that the pain had been subsided. What about the loss of quality of life issue? Is that something you can address? Right. There was testimony, and Your Honor, I believe, pointed out that in questioning to him. Counsel cites the ACOP case, which is a Louisiana Third Circuit Court of Appeal case, in which the plaintiff was awarded $150,000 for past general damage and $50,000 for future general damage. It's had a three-level lumbar fusion. On appeal, the general damages awards were not subject to the appeal, so there is really no discussion in the ACOP case about whether the plaintiff continued to be in pain, whether it impacted plaintiff's quality of life or lifestyle, whether it impacted the activities. There's none of that. It doesn't talk about what the plaintiff's age was, the things the plaintiff liked to do that the plaintiff couldn't do anymore. In this case, we have that testimony, and Your Honor referenced that it's all contained in that same area within the record, and that is it impacted him. He was 41 years old at the time of the incident, 43 or 44 now, and he testified about the impact that it had on him and about one of his major concerns is being able to find a job in the future once he recovers that will allow him to work because of his injuries. Clearly, he won't be able to go offshore anymore. Dr. Munchie, his treating neurosurgeon, indicated that he was going to have significant limitations, and yes, it was shortly after surgery, and yes, he had had some relief of his leg pain, the radicular pain that he had had, but he still had back pain, and Dr. Munchie testified that he would anticipate that he's going to have some pain for the rest of his life even if he has an unremarkable recovery. I mean, it's the nature of the condition and the surgery. You've got three levels in your lower back fuse, and that's the area weight bearing. So there is that evidence in the record where he discusses his loss of life and lifestyle, loss of activities, and Dr. Munchie testifies about what the plaintiff can expect in the future, no bending, stooping, and the other restrictions on his activities. There's also a cure issue as to whether McDermott was required to pay for the surgery. Yeah, and I, you know, to me that's by far the easiest. That and the negligence issue to me is, I mean, he had a surgery to resolve, and the treating physician, Dr. Munchie, testified that the purpose of the surgery was to resolve the underlying condition, and that's in the record at 838. But once you use that verb, resolve, then it's not palliative? Correct. Well, you don't have to, I mean, I guess the language isn't that. But if he'd said, you know, the surgery just was to reduce his pain, I can't guarantee he was going to get any physical improvement out of this. It was just the pain. Would Shaw not then have to pay for a cure? I think they still would because the purpose of the surgery was to resolve the underlying conditions, which were responsible for his symptoms, which were pain and some weakness and those sorts of things. But a surgery, there are not many circumstances that I can think of or know of when surgery isn't supposed to be curative. You know, the difference is between is it curative or is it palliative. Hopefully the surgery will be both. I mean... Okay. Unless Your Honors have any more for me, I appreciate it. Thank you. Thank you. Mr. Wells, you have some rebuttal time. Thank you, Your Honors. Judge Higginson, I have another case for you. It's Horn v. Weeks Marine. I didn't want to be stuck to that one case. That was in your brief too. That was in my brief as well. So that was a board propped up to get access to an engine, and it broke and he knew he shouldn't have stood on the board, and that's probably the most factually similar case to our case here. Thank you very much. Judge Clement, on the pain and suffering issue, the future general damages, even Dr. Munchie said it's too early in the process to know what his future recovery is going to be. Interestingly, the plaintiff didn't have surgery until five weeks prior to trial. We filed a motion to continue. It was denied. Some of the issues are does he have an FCE after the fact to know what his limitations are and capabilities are work-wise. We didn't even have time to do that because it was so short after the surgery. We didn't have a meaningful post-surgery IME to examine the plaintiff. Dr. Bertaccini testified live at trial, and he said that there was absolutely nothing that warranted surgery in this case, and this is unusual that one neurosurgeon testifies against another neurosurgeon to the effect that he deviated from the standard of care in performing surgery. It was to alleviate pain, which is palliative. Not only did Dr. Bertaccini testify about nonsurgical lesions, but also the radiologist testified about how minimal the findings were. So this was a surgery that, frankly, should never have been performed. What was it, a laminectomy? A three-level laminectomy and fusion. And a fusion. And a fusion. At three levels where there was just one minimal findings at one level and hardly any findings at all if you look at the radiologist studies on the other two levels. So this was a very radical surgery that Dr. Bertaccini, a very well-respected neurosurgeon from Lafayette, testified was a deviation from the standard of care. Or I didn't show any herniation? Did not. It showed some minimal impact on the thecal sac, which there was no significant impact on the thecal sac to cause any radiating problems or any neurological problems in his lower extremities. It was just localized back pain. Dr. Bertaccini recommended physical therapy and other means to rehabilitate the back pain, but there were no surgical lesions. There were no herniations that impacted any exiting nerve roots. There was nothing surgically to repair. No sciatica, which would impair his ability to walk? Nothing. Nothing, Your Honor. With respect to the life-changing experiences that you asked about earlier, there was no corroborating evidence from any family members. He lived with a lady for a long period of time. He had a daughter who he saw almost on a daily basis. He had two brothers that he went to the casino with. This was before the surgery and had an active lifestyle with. None of them testified at trial to corroborate the impact that this accident has had on his life. And the Fifth Circuit is replete with case law that says self-serving testimony in that respect is not competent evidence to support claims for either liability or damages. Just touching upon a couple of liability issues, no one knew that he was standing on a board that had a notch cut in it. I mean, that was absolutely clear. There was no evidence to that effect. That was the legal cause of the accident. Well, Mr. Abrams said that other workers were watching him. Well, they were around during different aspects of the job, and they saw him tapping on the board, but nobody was standing there supervising him, watching him. Tapping on the coil? I'm sorry? Tapping on the coil? Right. He said board. Using the board to tap on the spool. I'm sorry. And there were other people in the area, and they were walking around the deck, but he was doing the simplest task, and it was not dangerous. And had he either stayed on the deck or even gotten on the frame, which was just a two-height difference and used that shorter hammer, there would have been no danger. The pure legal cause of the accident was his selection of a board, which should not have been used, because it was from a wrap-banded deck board selection, and it was defective because it had the notch cut out of it. And nobody from McDermott knew that he was using that board, and it's implausible to think that the board was not resting on the frame when it cracked. That's just illogical. And so the evidence clearly supported that was the legal cause of the accident. ACOC versus on the future damage award, we do take cases that are on high and low, but the one that was almost directly on point was a three-level fusion in the ACOC Ensco offshore case, and there was, I think, a $200,000 past pain and suffering award and a $50,000 future because he had some minimal pain, or he had experienced some pain, but his condition improved after surgery. That's almost directly on point, and that's the one we cited in our brief. All right. Thank you. We have the argument. All right. That concludes the docket for today. We'll be in recess.